## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| THE UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF CONNECTICUT, THE STATE OF COLORADO, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF LOUISIANA, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, THE STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA, *ex rel*. DEAHONA MALOY,<br><br>       Plaintiffs,<br><br>       v.<br><br>ZYNEX, INC., ZYNEX MEDICAL, INC.,<br><br>       Defendants. | CIVIL ACTION NO. _____<br><br><br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

## RELATOR'S COMPLAINT PURSUANT
## TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.*,
## AND PENDANT STATE FALSE CLAIMS ACTS

1.    Plaintiff Deahona Maloy ("Relator"), on behalf of the United States of America,

the State of California, the State of Delaware, the District of Columbia, the State of Florida, the

State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of

Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan,

the State of Minnesota, the State of Montana, the State of Nevada, the State of New Jersey, the

State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, and the State of Wisconsin (hereinafter referred to as the "Plaintiff States") bring this case against Zynex, Inc. and Zynex Medical, Inc. (collectively, "Zynex" or "Defendants") for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.,* and State False Claims Acts ("State FCAs"): The California False Claims Act, Cal. Govt. Code §§ 12650 *et seq.*; The Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301b; The Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, §§ 1201 *et seq.*; The District of Columbia False Claims Act, D.C. Code Ann. §§ 2-3-8.03 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168, *et seq.*; The Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*; The Illinois Whistleblower Reward and Protection Act, 74 Ill. Comp. Stat. Ann. §§ 175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 *et seq.*; The Louisiana Medical Assistance Programs Integrity Law, La. R.S. §§ 46:437.1 *et seq.*; The Maryland False Health Claims Act, Title 2, Subtitle 6, §2-601 *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§ 5A *et seq.*; The Michigan Medicaid False Claims Act, MI Public Act 337, Public Acts of 2005, MCLS §§ 400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; The Montana False Claims Act, Mont. Code Anno. §§ 17-8-401 *et seq.*; The Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.01 *et seq.*; The New Jersey False Claims Act, N.J. State §§ 2A:32C-1 *et seq.*; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; The New York False Claims Act, NY State Fin. Law §§ 187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§ 1-605 *et seq.*; The Oklahoma Medicaid False

Claims Act, Stat. tit. 63 §§ 5053 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas False Claims Act, Tex. Hum. Res. Code §§ 36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.*; The Washington Medicaid Fraud False Claims Act, RCW 74.09.201 *et seq.*, and The Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§ 20.931 to recover all damages, civil penalties and all other recoveries provided for under the Federal FCA and the State FCAs.

## I.   SUMMARY OF THE ACTION

2.     This case involves Zynex's continuous and fraudulent billing of medically unnecessary supplies used with certain durable medical equipment (DME).  Beginning in at least 2010 and continuing through at least June 2013, Defendant Zynex has knowingly and fraudulently billed the government for supplies (e.g., electrodes and batteries) specifically used with certain electrical stimulation medical devices, including "TENS' devices, as well as for the devices themselves.

3.     A "TENS" (transcutaneous electrical nerve stimulation) device is a small unit resembling a television remote control that is used by an individual at home to relieve pain. Each device has 2 or 4 lead wires with attached electrodes.  The individual places the electrodes on his/her body around the area of pain in order to deliver electrical stimulation to the muscles, nerves and tissues.

4.     The supplies used to operate the TENS device – including, electrodes and batteries – must be replaced on a regular basis in order for the device to continue to be operative. Typically, the DME supplier who supplied the device, such as Zynex, will also supply the replacement items for the device.  Medicare, Medicaid and other government health care programs only reimburse for medically necessary TENS supplies (and devices). Even if a device

such as a TENS (or CPAP, or nebulizer, for example) has been appropriately prescribed and provided to a patient, experience has shown that patients often do not continue to use prescribed devices or do not use them as regularly or for as long as the use was prescribed, or simply do not need replacement supplies as frequently as government guidelines permit. In order to prevent unnecessary shipment of supplies and billing the government for replacement supplies when a patient is not actually using the TENS device, or using it less often than what may have been prescribed, or otherwise does not need additional supplies, the DME supplier is required to contact the patient every time replacement supplies are due to be shipped and verify that the patient needs the supplies and is in fact using the device.

5.      Zynex blatantly ignored these express requirements and routinely automatically shipped supplies and billed government health care programs.  Zynex's fraudulent conduct as alleged herein includes the following:

- Zynex failed to contact the patients prior to sending the batteries and electrodes to determine if the items were actually needed, and thus medically necessary.

- Zynex over-billed for supplies in that its billing exceeded the maximum utilization of supplies for a month.

- Zynex failed to monitor the patient's continued use of the supplies, failed to document such continued use (if any), and failed to stop billing the government when supplies were no longer being used by the beneficiary.

- Zynex failed to document in its records any continued medical need for the supplies by the patient and continued to ship supplies well beyond the patients' length of need.

- Zynex failed to obtain a request for a supply refill in writing from the beneficiary and/or Zynex failed to document in its records any phone conversation/contact between the supplier and beneficiary justifying the refill of supplies.

- Zynex routinely billed medically unnecessary supplies which were not used with a covered TENS or NMES device.

- Zynex upcoded the billing for the TENS devices which allowed it to overbill for supplies and the devices themselves.

6.     As long as the health insurance plans, including government health care programs, were paying for the TENS supplies, Zynex continued to ship and bill for supplies.  For many patients this continued for years, much longer than the patient's length of medical need or actual use of the device or supplies, costing the government thousands of dollars per patient.

7.     Zynex's business is heavily dependent on revenues generated from the fraudulent automatic shipping and billing of supplies.  For example, in 2012, Zynex earned almost $40 million in total net revenues from supplying TENS and other similar devices and the replacement supplies, with supplies accounting for 41% of those revenues, or $16.5 million.  Approximately 16% of Zynex's net revenues are derived from the Medicare and Medicaid programs.  Thus, about $6.4 million in total revenues (16% of $40 million) are from Medicare/Medicaid reimbursement for TENS devices and supplies; and specifically $2.6 million in reimbursement for supplies (16% of $16.5 million) are derived from government health care programs.  Based on Relator's observation that a majority of the supplies automatically shipped without patient authorization, and thus, were not medically necessary and improperly billed to Medicare/Medicaid.  As a result, Zynex has caused the government to overpay by millions of dollars for TENS devices and supplies throughout the relevant time period of at least 2010 through June 2013.

8.     The automatic shipment of supplies by DME suppliers is a serious area for concern for the government.  The Department of Health and Human Services, Office of the Inspector General has previously focused on this issue as an area of fraud and abuse.  And in its Work Plan for 2014, the OIG stressed that it will continue to review claims for frequently replaced DME supplies to determine compliance with medical necessity, frequency and other

requirements.  Specifically, it states, "Suppliers may not initiate refills of orders, and suppliers must not automatically dispense a quantity of supplies on a predetermined regular basis."  HHS OIG Work Plan: FY 2014, pg. 13.

## II.   <u>THE PARTIES</u>

9.      Defendant Zynex, Inc., a Nevada corporation, is a medical device and supplies company headquartered in Lone Tree, Colorado.  Zynex, Inc. is publicly traded under the ticker symbol "ZYXI."  Zynex, Inc. is made up of a number of different subsidiaries, including, *inter alia*, Defendant Zynex Medical, Inc. (provider of electrotherapy products for home use, such as TENS and NMES devices at issue in this complaint), Zynex Monitoring Solutions (cardiac monitoring products), and Zynex NeuroDiagnostics (neurological diagnostic devices).[1]  Zynex, Inc. reported revenues of almost $40 million for 2012.

10.      Defendant Zynex Medical, Inc. is a Colorado corporation with its corporate office located at 9990 Park Meadows Drive, Lone Tree, Colorado.  Zynex Medical, Inc. is a wholly-owned subsidiary of Zynex, Inc.  Zynex Medical, Inc. provides electrotherapy products to patients to use in their homes.  It does business nationwide.  Its main product is called the "NexWave" and it is reimbursed by Medicare, Medicaid and other government health care programs.  Throughout this Complaint, Zynex Medical, Inc. and Zynex, Inc. are collectively referred to as "Defendant" or "Zynex."

11.      The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded health care programs including Medicare, Medicaid, Tricare, and the Veterans Administration.

---

[1] http://www.zynexmed.com/company-overview/.

12.     The Plaintiff States are parties to this action.  It is Relator's belief that Zynex sold its devices to patients in all of the Plaintiff States and submitted false claims for reimbursement to the Plaintiff States' Medicaid programs.

13.     Relator Deahona Maloy is a resident of Aurora, Colorado and a citizen of the United States.  Relator worked for Zynex as a worker's compensation billing caseworker from approximately April 2010 until June 2013.  In her former position at Zynex, she routinely billed and submitted claims for TENS devices and supplies.  The allegations in this Complaint are based upon information Relator discovered through her work at Zynex and through her own personal efforts, observations and investigation.

## III.   JURISDICTION AND VENUE

14.     Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act"), 31 U.S.C. § 3729 *et seq*., specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

15.     Venue in the District of Colorado is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, Defendant Zynex is located in Colorado, transacted business in Colorado and/or submitted or caused the submission of false claims in Colorado.

## IV.   THE FALSE CLAIMS ACT

16.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

17.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

18.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

19.     All of the Plaintiff States have State FCAs modeled after the Federal False Claims Act which contain substantially similar provisions to those cited above.

## V.     THE LAW REGARDING GOVERNMENT HEALTH CARE PROGRAM REIMBURSEMENT FOR TENS DEVICES AND SUPPLIES

### A.     Government Health Care Program Coverage of TENS Devices and Supplies

20.     Medicare coverage of TENS devices is provided for under both Medicare Parts A and B.

21.     Medicare covers the cost of TENS devices and supplies for the relief of acute pain after surgery.  That is, "[w]hen used for the purpose of treating acute post-operative pain, TENS devices are considered supplies.  As such they may be hospital supplies furnished [to] inpatients covered under Part A, or supplies incident to physician's service when furnished in connection with surgery done on an outpatient basis, and covered under Part B."  National Coverage Determination (NCD) for Transcutaneous Electrical Nerve Stimulation (TENS) for Acute Post-Operative Pain (10.2), Pub. No. 100-3, effective 8/7/1995.  When a person is prescribed a post-surgery TENS device, Medicare only covers the cost for "relatively short periods of time, usually 30 days or less."  *Id.*

22.     Medicare also reimburses for TENS devices and supplies under Part B when the patient requires the device for the treatment of chronic, intractable pain (except for chronic lower back pain, unless certain very limited requirements are met).  Medicare Part B provides coverage for such items under the benefit for durable medical equipment (DME), prosthetics, orthotics and other supplies.  42 U.S.C. §1395x(n); 42 C.F.R. pt. 414, subpt. D.  TENS devices are considered DME and are specifically classified as "inexpensive or routinely purchased items."  42 C.F.R. §414.210, §414.220. §414.232.

23.     Medicare coverage also extends to "NMES" (neuromuscular electrical stimulation) devices when used under certain conditions.  An NMES device delivers a different type of electrical current than the TENS device and instead of treating chronic pain, it is used to help patients with muscle disuse atrophy where the nerve supply to the muscles is intact (e.g., used (?) when a limb is in a cast or splint).  The unit is used with electrodes to deliver a current to the muscles in order to stimulate the muscle groups.

24.     The majority of State Medicaid Programs also cover the cost of TENS devices and necessary supplies.  Office of Inspector General (OIG), Transcutaneous Electrical Nerve Stimulation (TENS) Devices, OAI-02-88-00060 (July 1989), pg. 6.  "Almost all [states] require prior approval, meaning that a claim must be submitted with documentation of need and effectiveness prior to reimbursement."  *Id.*

25.     For example, Colorado Medicaid uses the same HCPCS codes for billing as Medicare.  Colorado requires a Prior Authorization Form ("PAR") before reimbursing for a TENS or NMES device for a patient.  The PAR must be signed by a physician and include answers to a number of different questions in order to determine that the device is medically necessary for the patient (e.g., "Identify any of the above medications that were discontinued as a

result of the use of TENS or NMES[,]" "Did the client's range of motion or mobility improve as a result of using a TENS or NMES?").  *See, e.g.*,  Medi-Cal Provider Manuals, DME: Bill for DME; DME:  Billing Codes and Reimbursement Rates (California's Medi-Cal Program covers the cost of TENS devices and supplies and requires prior authorization before reimbursement); New York State Medicaid Program, Durable Medical Equipment Manual, Policy Guidelines; New York State Medicaid Program, Durable Medical Equipment, Orthotics, Prosthetics, and Supplies, Procedure Codes and Coverage Guidelines (The New York Medicaid Program covers TENS devices and supplies provided to Medicaid participants, however, the supplier must obtain a prior authorization through the Dispensing Validation System).

### B.    Only Medically Necessary Devices and Supplies are Reimbursed

26.    No matter whether covered by Medicare or Medicaid or another government health care program, these programs only reimburse for medically necessary TENS devices, NMES devices and supplies. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 410.38(f).  That is, TENS devices and supplies are excluded from coverage under Medicare and other government health care programs if they are "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A).  Suppliers must verify that devices and supplies are "provided economically and only when, and to the extent, medically necessary . . . " 42 U.S.C. §1320c-5(a).

### C.    Claims Submission

27.    Suppliers such as Zynex submit claims for Medicare reimbursement to private companies hired by CMS to administer claims for DME.  These companies are called DME Medicare Administrative Contractors (DME MACs) and they cover one of four jurisdictions in the United States.  For example, the DME MAC, National Government Services, covers claims

submitted in Jurisdiction B which includes Illinois, Indiana, Kentucky, Michigan, Minnesota, Ohio and Wisconsin.  The DME MACs for the other jurisdictions are as follows:  Jurisdiction A – NHIC; Jurisdiction C – CGS Administrators; and Jurisdiction D – Noridian Administrative Services.

28.     Suppliers electronically submit claims for payment to DME MACs on CMS Form 1500.  Suppliers submit claims using unique codes, called HCPCS codes.  The supplier is also required to indicate whether the item is being billed as a purchase or a rental by using a "modifier" to the HCPCS code:  "RR" is the modifier indicating rental; "NU" indicates a purchase.

29.     TENS and NMES devices are reimbursed by Medicare and other government health care programs under the following HCPCS codes:

| HCPCS | DESCRIPTION |
|-------|-------------|
| E0720 | TENS unit, 2 leads (2 electrodes) |
| E0730 | TENS unit, 4 leads (4 electrodes) |
| E0745 | NMES unit, 4 leads (4 electrodes) |
| E1399 | DME miscellaneous code |

30.     Supplies are billed using the following HCPCS codes:

| HCPCS | DESCRIPTION |
|-------|-------------|
| A4595 | Electrical stimulator supplies (includes electrodes, conducive paste or gel, tape or other adhesive, adhesive remover, skin preparation material, batteries, battery charger (if needed)). |
| A4556 | Replacement electrodes |
| A4557 | Replacement lead wires |
| A4630 | Replacement batteries |
| E0731 | Form-fitting conductive garment for delivery of TENS or NMES |

31.    Medicare reimburses for the devices and supplies based on the DMEPOS Fee Schedule.  Medicare reimburses the devices at the rental amount for 1-2 months and then at the purchase amount if medical necessity is established.  The rental rate is 10% of the purchase amount and if the device is eventually reimbursed as a purchase, the purchase rate is not reduced by the rental payments.

32.    The following are the nationwide reimbursement ranges (ceiling and floor) from the DMEPOS Fee Schedule for the relevant devices and supplies:

| HCPCS | DESCRIPTION | REIMBURSEMENT |
|-------|-------------|---------------|
| E0720 | TENS unit, 2 leads (2 electrodes) | $341.67 - $401.96 (rental: approx. $34-$40 per month) |
| E0730 | TENS unit, 4 leads (4 electrodes) | $344.44 - $405.22 (rental: approx. $34-$40 per month) |
| E0745 | NMES unit, 4 leads (4 electrodes) | $83.21- $97.89 (for rental per month) |
| A4595 | Electrical stimulator supplies | $26.78 - $31.51 (for one unit) |
| A4556 | Replacement electrodes | $11.29 - $13.28 |
| A4557 | Replacement lead wires | $19.62 - $23.08 |
| A4630 | Replacement batteries | $5.81 – $6.83 |
| E0731 | Form-fitting conductive garment | $331.55 - $390.06 |

33.    There are ranges given for the above devices and supplies because reimbursement for the relevant HCPCS codes varies by state.  For example, in Colorado, E0720 (2-lead TENS) is reimbursed at $398.75 whereas in Texas, it's reimbursed at $382.47; and for E0730 (4-lead TENS), Medicare reimburses $401.96 in Colorado and $391.22 in Texas.

34.    One of Zynex's main products is called the "NexWave."  It is like "3 Devices in 1" in that it can operate as a TENS device, an NMES device or an Interferential Current (IFC) device.  Therefore, if Zynex provided a NexWave device to a patient, it would bill insurance (including government health care programs) based on how the physician specified the device

should be used (e.g., Zynex should bill using the E0720 code if the prescription specified TENS functionality, Zynex should bill using the E0745 if the prescription specified NMES). Some of Zynex's other products include the TruWave TENS and the ValueTENS II.

**D.** **Suppliers Must Verify That the TENS Supplies are Medically Necessary and Must Not Automatically Ship and Bill For Supplies**

35.     As discussed above, Medicare and other government health care programs only cover the cost of  supplies such as the electrodes and batteries needed to operate the TENS devices if they are medically necessary, which includes a verification of whether the patient is actually using the device and exhausting his or her supply of the replacement supplies. In order to ensure that the TENS supplies are medically necessary for the patient, Medicare requires the supplier to call the patient before sending the supplies.

36.     Specifically, the CMS rules regarding supplies provided on a recurring basis, such as the electrodes and batteries used with the TENS devices, state the following:

> For DMEPOS products that are supplied as refills to the original order, suppliers *must contact the beneficiary prior to dispensing the refill and not automatically ship on a pre-determined basis*, even if authorized by the beneficiary. This shall be done *to ensure that the refilled item remains reasonable and necessary*, existing supplies are approaching exhaustion, and to confirm any changes/modifications to the order. Contact with the beneficiary or designee regarding refills must take place no sooner than 14 calendar days prior to the delivery/shipping date. For delivery of refills, the supplier must deliver the DMEPOS product no sooner than 10 calendar days prior to the end of usage for the current product.

CMS Program Integrity Manual, Internet-Only Manual, CMS Pub. 100-8, Chapter 5, Section 5.2.6 (emphasis added).

37.     Thus, the supplier must contact the patient prior to sending the batteries and electrodes to determine if the items are medically necessary and need replacement, and must not

automatically ship and bill the supplies.  The patient must be contacted no sooner than two weeks in advance of shipment and must receive the refill if needed within ten days of running out of supplies.

38.    In addition to the CMS Manual requirements, Local Coverage Determinations (LCDs) set forth the reasonable and necessary criteria for Medicare coverage according to each DME MAC jurisdiction.  Each of the four DME MAC jurisdictions has an LCD in effect setting forth the relevant medically necessity criteria for reimbursement of TENS devices and supplies. All of these LCDs are substantially similar.[2]

39.    With regard to TENS device supplies, the LCDs state that in order to receive reimbursement for supplies, there must first be a covered TENS unit.  That is, the supplies are not reasonable and necessary if Medicare never paid for the underlying TENS device in the first instance.  Further, for the 2-lead TENS device (E0720), suppliers are only allowed to bill one unit of the supply kit per month (A4595); and for the 4-lead device, the maximum billing is two units of the supply kit (A4595).  Specifically, the LCDs state:

> Supplies
>
> Separate allowance will be made for replacement supplies when they are reasonable and necessary and are used with a covered TENS.  Usual maximum utilization is:
>
> - 2 TENS leads – a maximum of *one unit* of A4595 per month
> - 4 TENS leads – a maximum of *two units* of A4595 per month.
>
> *****
> Reimbursement for supplies is contingent upon use with a covered TENS unit.  Claims for TENS supplies provided when there is not covered TENS unit will be denied as not reasonable and necessary.

Noridian, LCD: TENS (L11495), pg 2 (emphasis added).

---

[2] For Jurisdiction A:  NHIC, Corp, LCD: Transcutaneous Electrical Nerve Stimulators (TENS) (L11506); for Jurisdiction B: National Government Services, LCD: TENS (L27031); for Jurisdiction C: CGS Administrators, LLC, LCD: TENS (L5031) and; for Jurisdiction D: Noridian, LCD for TENS (L11495).

40.     In addition, in order for the supplies to be reimbursed as reasonable and necessary for the treatment of a Medicare beneficiary, the supplier must first contact the beneficiary to determine if the supplies are needed:

> REFILL REQUIREMENTS
>
> *****
>
> For all DMEPOS items that are provided on a recurring basis, suppliers are required to have contact with the beneficiary or caregiver/designee prior to dispensing a new supply of items. Suppliers must not deliver refills without a refill request from a beneficiary. *Items delivered without a valid, documented refill request will be denied as not reasonable and necessary*.

*Id.* at 3 (emphasis added).

41.     The LCDs include requirements as to the Medical Record Information needed to justify reimbursement.  With regard to the ongoing use of supplies, the LCDs emphasize that the DME supplier must monitor the patient's continued use of the supplies, must document such continued use, and must stop billing Medicare when supplies are no longer being used by the beneficiary:

> CONTINUED USE
>
> *****
>
> Suppliers are responsible for monitoring utilization of DMEPOS rental items and supplies. … Suppliers *must discontinue billing Medicare* when rental items or ongoing supply items are no longer being used by the beneficiary.
>
> Beneficiary medical records or supplier records may be used to confirm that a DMEPOS item continues to be used by the beneficiary.

*Id.* at 5 (emphasis added).

42.   Further, the supplier must document in its records that the supplies continue to be used by the beneficiary.  As stated in the LCDs:

> CONTINUED MEDICAL NEED
>
> *****
>
> For ongoing supplies and rental DME items, . . . there must be information in the beneficiary's medical record to support that the item continues to be used by the beneficiary and remains reasonable and necessary. . . . Any of the following may serve as documentation justifying continued medical need:
> 1.     A recent order by the treating physician for refills
> 2.     A recent change in prescription
> 3.     A properly completed CMN [Certificate of Medical Necessity] or DIF [DME Information Form] with appropriate length of need specified
> 4.     Timely documentation in the beneficiary's medical record showing usage of the item.

*Id.*

43.   In addition, as to the documentation required and timing of the refill of supplies, the LCDs state:

> REFILL DOCUMENTATION
> *****
> For items that are delivered to the beneficiary, documentation of a request for refill must be *either a written document received from the beneficiary or a contemporaneous written record of a phone conversation/contact between the supplier and beneficiary*.  The refill request must occur and be documented before shipment.  A retrospective attestation statement by the supplier or beneficiary is not sufficient.

*Id.* at 6 (emphasis added).

## VI.   <u>FALSE CLAIMS ACT ALLEGATIONS</u>

### A.   <u>Zynex Automatically Shipped and Billed  Supplies, Rendering Them Medically Unnecessary and Ineligible for Reimbursement</u>

44.   All of the Zynex billing departments were instructed to automatically ship and bill for supplies.  This was the standard practice.  During training,  billing employees   were

16

instructed to set up new account files by adding a certain code to the computer database to set up automatic shipping and billing for replacement supplies as soon as a TENS or similar unit was provided to a patient. This code was sometimes referred to as the "batch" code.

45. Throughout Relator's employ, Zynex utilized this automatic shipping system and did not typically contact patients for authorization to ship supplies. The computer system would then automatically bill the patient's insurance carrier, including Medicare and Medicaid, each month for supplies.

46. Zynex's computerized patient files (under the "Billings" tab) show consistent billings for TENS supplies every month, on the same day every month, in the maximum amount permitted by the insurer or healthcare program. This consistency would be incredibly improbable if supplies were only being shipped on an "as needed" basis because many patients do not continue to use a prescribed device, do not use it as often or for as long as it was prescribed, or simply do not replace the electrodes or batteries as often as the replacement allowances permitted.

47. In order to stop the auto-billing, the billing department employee needed to manually enter a code. Zynex only would stop billing supplies if contacted by the patient or insurance carrier, which was an unusual and rare occurrence.

48. The automatic shipping and billing for supplies is directly contrary to the requirement that in order for DME supplies to be considered reasonable and necessary for government reimbursement, the supplier must first call the patient before sending the supplies and must not automatically ship on a pre-determined basis. Despite these explicit requirements, Zynex only randomly contacted the patients in advance of shipping and billing for supplies.

49.      If insurance, including Medicare and Medicaid, continued to reimburse, then Zynex continued to ship and bill.  Each patient's computer file has a "Patient Notes" page in which the Zynex employees record such things as communications to/from the insurance company, if the patient called in to Zynex, if the employee attempts to contact the patient.  Many of the "Patient Notes" in the computer system have entries such as "supplies still paying and shipping, no further action at this time" or "Hi [health insurance] paying cont[inue] supplies" with absolutely no record that the patient was contacted and verified the need for more supplies.

50.      Although Zynex's Policy/Training Manual does contemplate the employee calling the beneficiary, this was not a consistent practice.  The Policy/Training Manual's emphasis on continual billing is clear.  In the section titled "Rebilling a file", the billing department is instructed to call the patient and see how they are doing with the unit.  The Manual states, "If the patient no longer uses the unit, and the insurance is paying, try and talk the patient into keeping the unit."  Also, the Manual instructs the billing department to ask how they are doing on supplies.  There is no instruction as to what to do if the patient indicates that they no longer need the supplies.  There is no consideration of medical necessity.  Instead, the Manual states, "Since you will be billing for [supplies], you want to make sure the patient is getting the supplies", as if billing for supplies is a foregone conclusion.

51.      In training materials, former Worker's Comp Supervisor, Jamie Keller, instructed Zynex staff to stop billing for TENS units when the purchase price was met, but to "keep billing for supplies until the patient calls to discontinue them or the work comp denies them."  It is Relator's understanding that billing to Medicare and Medicaid was handled in the same manner. Zynex continued to auto-ship and auto-bill for supplies for as long as possible, until the patient called or the government denied the claims for supplies, which rarely happened.

52.     Evidence that patients were not being contacted in advance of shipment includes instances of continued shipment after a patient's death. In at least one instance, in February 2013, the patient died however, Zynex continued to automatically ship and bill the patient's insurance for supplies for months after the patient's death.

53.     Also, patients would sometimes call and ask Zynex to stop sending supplies. One person called on behalf of her deceased husband and demanded they stop sending supplies. Relator remembers several other calls on behalf of deceased individuals asking Zynex to stop sending supplies to the decedent's home.

54.     In the rare instances when a Zynex caseworker actually called and reached a patient, the patient would often state that they practically had a drawer full of unused electrodes and batteries, or a closet full of supplies or, in effect, "enough to last a lifetime."

55.     Relator was told by her supervisory Jamie Keller, in essence:  "If you can't get money off the TENS unit, then get if off the supplies."  As discussed more fully below, Zynex would often obtain denials on claims for reimbursement for devices from government health insurance programs, however, despite these denials, Zynex continued to bill for TENS supplies.

### B.     Specific Examples of False Claims

56.         The below patient examples (patients #1-3) demonstrate how Zynex billed government health insurance programs for false claims for medically unnecessary supplies.  The following examples set forth how Zynex violated the medical necessity and supplier documentation requirements for billing TENS supplies:

- Zynex failed to contact the patients prior to sending the batteries and electrodes to determine if the items were medically necessary.

- Zynex over-billed for supplies in that its billing exceeded the maximum utilization of supplies for month.

- Zynex failed to monitor the patient's continued use of the supplies, failed to document such continued use (if any), and failed to stop billing the government when supplies were no longer being used by the beneficiary.

- Zynex failed to document in its records any continued medical need for the supplies by the patient and continued to ship supplies well beyond the patients' length of need.

- Zynex failed to obtain a request for a supply refill in writing from the beneficiary and/or Zynex failed to document in its records any phone conversation/contact between the supplier and beneficiary justifying the refill of supplies.

    1.     **Patient #1: Zynex Billed Colorado Medicaid for Supplies for at Least 18 Months with No Patient Contact**

57.     On January 20, 2012, Zynex customer service received a prescription for a device for a Colorado Medicaid patient ("patient #1").  On January 23, 2012, the billing department opened a new file for the patient and called the patient and left a message.  That was the only call made to this patient.  From January 2012 through at least June 2013, Zynex auto-shipped supplies to the patient and falsely billed Colorado Medicaid.  Consistently every month, Zynex billed for four units of the supply kit (A4595) for approximately $170 and four 9-Volt Batteries (A4630) for approximately $39.96.

58.     Throughout the eighteen-month period, there were no attempts made by Zynex to reach the patient to verify the need for and/or the receipt of these supplies.  Zynex's only concern was whether Colorado Medicaid continued to pay for the supplies.  On December 23, 2012, almost a year after the patient purportedly started using the device, Zynex still had not contacted the patient.  Instead, the billing department noted, "HI [health insurance] paying on supplies at this time" and on January 14, 2013, "HI paying, no action at this time."  In sum, Zynex billed Colorado Medicaid for at least 18 months (and possibly more) of medically unnecessary supplies, ultimately receiving $730.80 in fraudulent reimbursements.

    2.      **Patient #2: Zynex Billed CO Medicaid for Supplies for at Least 2 Years with No Patient Contact**

59.     Another Colorado Medicaid patient ("patient #2") actually contacted Zynex around March 2010 and requested supplies for her TENS unit. Zynex responded by sending her supplies and appropriately billing Medicaid. The patient contacted the company a few additional times to request more supplies throughout 2010 and part of 2011 (with the last patient contact in April 2011). Zynex, however, continued to bill Medicaid for supplies for at least the next two years. Zynex at no time tried to reach out to the patient during the two-year period to verify that she needed the supplies. In fact, Zynex noted that it was "leaving [the patient account billing] on supplies until hear from [patient] not needing any longer." And, almost two years after the last contact with the Medicaid patient, Zynex noted that the TENS unit was purchased but "HI paying, no action at this time" meaning that they would continue to bill for supplies because Colorado Medicaid was covering the costs.

60.     Through June 2013, Colorado Medicaid paid a total of $1,638.86 in fraudulent billings. It is possible that the auto-shipping and billing to this patient continues to the present.

    3.      **Patient #3: Zynex Billed Managed Medicare/Medicaid for Supplies for at Least 2 Years with No Patient Contact**

61.     A Caresource (Caresource offers managed Medicaid/Medicare plans to patients in Ohio and managed Medicaid to patients in Kentucky) patient (patient #3), received a TENS unit in February 2011. The patient notes reflect that the unit was working well at that time. That was the only patient contact documented in the notes. Caresource never authorized reimbursement for the unit. It appears from the notes that the unit was never paid for by Caresource or the patient. However, Caresource continued to pay for the supplies. Thus, Zynex continued to ship and bill for supplies for almost two years after the last patient contact. Because

Caresource continued to pay, Zynex continued to bill and ultimately received $2,000 in fraudulent reimbursements.

### C.     Zynex's Billing Scheme Extended Nationwide

62.     Zynex provides devices and supplies to Medicare and Medicaid beneficiaries nationwide, accounting for over $6 million in revenue for 2012 alone.  Zynex's claims to government health care programs are  submitted from one, centralized office in Colorado.  The Zynex billing office is organized into different departments based on the type of patient insurance – the Medicare department (which includes Medicaid as well); the Anthem BC/BS department, HMO/PPO 1 (Aetna, Cigna, Humana, Kaiser, Vista, United) department, HMO/PPO 2 department (all other insurance carriers), worker's comp I department and worker's comp II department.  All the different billing departments are located on the 2nd floor of the Zynex building in Lone Tree, Colorado.  This was considered the "billing floor," with all the different billing departments located together.

63.     As of 2012, Zynex employs over 200 field sales representatives to promote its devices to physicians, physical therapists and other providers nationwide.   The sales representatives are organized into regions such as Southeast, Western, Northeast, and Great Lakes.  However, billing for all these sales of Zynex devices is handled in one central location, where Relator worked.

64.     Typically, a physical therapist recommends a TENS unit to a patient for treatment of the patient's pain and injury.  The physical therapist may include the TENS unit in the patient's treatment plan.  The physical therapist obtains a signed prescription for the unit from the patient's referring physician.  When the Zynex representative calls on the physical therapist, the sales rep obtains a copy of the prescription and fills out a Patient Information Form and submits all the information to the central Zynex billing office.  The sales representative is then

able to give the patient a device at the physical therapist's office.  Or sometimes the patient's physician recommends a TENS device; in those instances, the physician faxes the necessary paperwork to the Zynex central billing office and either the sales representative fits the patient with a device at the patient's home or Zynex directly mails the patient the device and supplies.

### D.   Zynex Routinely Billed Medically Unnecessary Supplies Which Were Not Used With a Covered TENS Device

65.    Zynex routinely billed for supplies even when it had not received reimbursement from Medicare, Medicaid and other government health care programs for the underlying TENS device.  Even when Zynex obtained a claims denial, it continued to automatically ship and bill for TENS supplies.  This is in violation of the requirement that in order for the supplies to be considered reasonable and necessary for reimbursement purposes, there must first be a covered TENS unit.

66.    Medicare requires that the patient use the TENS device for a 1-2 month trial basis before purchasing the device.  Medicare reimburses for this trial period as a rental.  If a physician determines that the device is "medically appropriate" for the patient, then the supplier may bill for reimbursement of the unit as a purchase.  In order to justify the purchase, the supplier must have a signed Certificate of Medical Necessity from the physician which certifies that the device is likely to therapeutically benefit the patient over a longer period of time.  See Medicare Program Integrity Manual, Ch. 5, §5.3; Medicare Claims Processing Manual, Ch. 20, §30.1.2; 42 C.F.R. §414.232.

67.    Contrary to the Medicare requirement that the TENS unit must be billed as a rental for 1-2 months and then billed as a purchase after establishing medical necessity, it is Relator's belief that Zynex routinely billed for the purchase of the devices at the outset or billed as rental but then billed as a purchase without obtaining the CMN from the physician.

23

68.     According to Tawanda Scott, former Medicare billing caseworker, Zynex's Vice President of Reimbursement Lisa Magleby told the Medicare department to bill all units as purchases.  And, that if Medicare denied the purchase, then Zynex should just send the patient a letter stating that the patient may purchase the unit (prices listed ranged from $250-$495) or return the unit to the company.  All the while, Zynex continued to bill Medicare for supplies.

69.     Similarly, it is Relator's belief that Zynex billed Medicaid programs for TENS devices without submitting the required prior authorizations and continued billing for supplies even after obtaining Medicaid claims denials.  This often occurred at "Bill-A-Thons" discussed below.

70.     Fraudulently making money on supplies and forfeiting the amount of the government reimbursement for the units, seems to have been a business decision made by Zynex. Zynex manufactures its own units which are apparently very inexpensive to make.  A TENS unit may be purchased without a prescription on such websites as www.amazon.com or www.overstock.com for as little as $35-50.  Although if Zynex was successful in obtaining government reimbursement, it could be in the $3-400 range, there was also a lot of money to be made on monthly, automatic shipments of supplies.

**E.      Bill-A-Thons/ Bill-A-Tons: Zynex Improperly Billed for Devices and Supplies**

71.     Zynex was often willing to rush the billing for devices – even at the risk of not getting reimbursed for the devices – in order to instead get the automatic shipments of supplies started for patients.  This frequently occurred at the end of every quarter, when Zynex held "Bill-A-Thons" or "Bill-A-Tons" in order to bill out as many devices and supplies as possible.  Relator attended almost every Bill-A-Thon during her time working at Zynex.  Zynex required each billing department to have 2-3 people stay late, sometimes until midnight, to bill out all new files

24

and any open accounts receivable files (patient files for which payment was pending due to missing information such as medical records, prior authorization, etc.).

72.    At these "Bill-A-Thons," Zynex directed the billing caseworkers to submit bills for any new patients if they had a prescription and a Patient Information Form for the patient and not wait for any prior authorizations.

73.    On June 17, 2013, the Vice President of Reimbursement emailed Zynex's CFO (Anthony Scalese), COO and owner (Thomas Sandgaard), and all the billing department supervisors, including the Medicare/Medicaid supervisor (Lisa Herrera), highlighting the total number of files not billed (3,531), including 604 files for Medicaid and 1,897 files for Medicare. She notes that "there are approx. 1831 files that are marked complete in the database, however, may not truly be complete for billing (i.e. Ins is invalid upon verification, etc.) which could potentially be $616,010.74 [if] billed out" and that there are 1700 incomplete files which could be additional billings of $523,536.90.   The total amount of all the unbilled files represents potentially $1,139,547 in additional billings.

74.    Earlier on the same day, the Zynex Vice President of Reimbursement directed Relator and the other worker's compensation caseworkers to "bill everything out" and "not hold billing for auth[orizations]."   It is Relator's belief that all the other departments including the Medicare/Medicaid department received the same instruction to bill all the files and not wait to obtain prior authorizations.

75.    Therefore, Zynex billed for the TENS device without the proper medical documentation and started billing supplies on an ongoing basis.   Some insurance companies never paid for the devices (and nor did the patient).   In some of those instances, Zynex just considered the device "purchased" because it had billed and receive so much in reimbursements.

For example, patient #4, a Colorado Medicaid beneficiary, initially received the TENS unit on around October 2010.  Zynex tried but was unsuccessful in obtaining reimbursement for the unit from Colorado Medicaid.  By October of 2012, even though it had not yet received payment for the device, it considered the device "purchased" because of the reimbursements it had already fraudulently received for the supplies.  As of March 2013, Zynex continued billing for supplies, almost two and a half years after the patient received the device.  Those billings may not have been stopped and possibly continue to the present.  As noted for the March 2013 Patient Notes, "HI [Health Insurance] Paying, no action at this time."

### F.   Zynex Upcoded the Billing for the TENS Devices Which Allowed It to Overbill for Supplies

76.    From approximately 2010 until early 2013, it is Relator's belief that Zynex upcoded the billing for TENS devices and overbilled for supplies on claims submitted to the government health care programs for reimbursement.

77.    Relator and other case managers were directed by their supervisor to upcode if they were billing for a TENS prescription.  That is, instead of billing the E0720 code (for a 2-lead TENS device), they were told to always bill E0730 (the 4-lead TENS device) even if only a 2-lead TENS was prescribed.  And, in fact, for most of her tenure at Zynex, Relator was unaware of the existence of the E0720 code.

78.    In order to properly bill E0730, the medical record must justify the use of a 4-lead device, such as the patient's treatment area is too large for two leads or the patient needs treatment on more than one area of their body requiring 4 leads.  Even without the proper medical justification, Zynex routinely and fraudulently billed using the E0730 code when only the E0720 device was medically necessary.

79.     Although  using the E0730 code for the 4-lead TENS,  only lead to a small amount more in reimbursement ($344-405 vs. $341-$401 for the E0720 device),  defendant was able to bill twice the amount of supplies.  With 4-leads, the E0730 device  is authorized for twice the amount of supply kits than the 2-lead device.  The Medicare allowance for the 2-lead TENS is one supply kit per month (A4595) and two kits for the 4-lead TENS.  Thus, by upcoding to the 4-lead device, Zynex was able to bill for extra supply kits generating an additional $31 per month in reimbursements.

80.     In around the Spring of 2013, Zynex attempted to revise its written policies to comply with Medicare, Medicaid and other health insurance program's billing requirements regarding the 2-lead or 4-lead devices.  Even though some of these policies seemed accurate on paper, they were often contradicted by verbal instructions by Zynex.

81.     For example, around the same time in the Spring of 2013, Zynex's Vice President of Reimbursement told the staff (paraphrasing): "Act as if the 720 doesn't exist in our world; just bill 730."  Often verbal instructions such as this direction to bill for the 4-lead TENS device (and never for the 2-lead TENS) contradicted Zynex's written policies.  However, it was understood that employees would be fired if they did not follow the verbal directives.

G.     **Zynex Knew That it Was Violating the Law in Automatically Shipping and Billing Supplies**

82.     In contrast to how Zynex automatically billed medically unnecessary supplies to Medicare, Medicaid and other government health plans, Zynex followed the proper procedure with respect to Pinnacol Assurance, a company offering worker's compensation insurance.  This was after Pinnacol strongly complained a number of different times to Zynex, specifically about Zynex's billing practices related to TENS device supplies sent to Pinnacol's patients.  Pinnacol

was upset that Zynex automatically shipped supplies to Pinnacol's patients, without the patients' consent or confirmation that the patients in fact needed the supplies.

83.     On June 17, 2013, Zynex's Vice President of Reimbursement, Lisa Magleby, emailed the following high importance message to the worker's comp caseworkers:

> Hi Team,
>
> Per our contract we cannot auto-ship supplies to any Pinnacol patients at any time. We need to start using a monthly calling system per your alpha split for you to call each pnt monthly and ask if they would like their supplies shipped or not. I will have James Taylor show you the process.

84.     This message highlights that Zynex failed to have a process or procedure in place for caseworkers to make monthly calls to patients before shipping them supplies. When Ms. Magleby states that she will have James Taylor show them the process for making monthly calls to the patients, it is clear that the caseworkers have never done this before but instead have automatically shipped and billed supplies per Zynex's instruction.

85.     Further, on June 21, 2012, Zynex's Vice President of Reimbursement again emailed the caseworkers, again revealing how Zynex never routinely called patients prior to sending refills of supplies:

> Hi Team,
>
> Marianne Wilson, our Pinnacol contract liaison will be pulling a report in 30 days to make sure that we are calling all of [our] Pinnacol pnts for resupply. She will gather a few names and call them to see if they received a call from us for their supply shipments. Please make sure you are going through all your Pinnacol pnts and calling them on their bill anniversary date for supplies [sic] refills.

**H.      Zynex's False Claims**

86.     As detailed above, Zynex submitted false claims to Medicare and other government health care programs for reimbursement for medically unnecessary TENS devices

and supplies and other DME.   Patients #'s 1-4 are representative examples of false claims submitted for reimbursement.  Although presumably some of the patients who were put on the automatic shipping regimen actually needed some of the supplies some of the time, Zynex's use of automatic shipping and its failure to obtain patient authorization for the shipments renders all of those charges ineligible for reimbursement under government health care programs.

87.     Specifically, Defendant Zynex submitted or caused to be submitted CMS Form 1500s for reimbursement for the TENS devices and supplies it provided to Medicare and other government health care program beneficiaries.  The Form 1500 requests information about the patient, insurance coverage, the diagnoses, and the services and items provided for which reimbursement is requested.

88.     The supplier must also sign CMS Form 1500 submitted to CMS for reimbursement of the devices and supplies.  The supplier's signature constitutes an express written certification that "the services shown on the form were medically indicated and necessary to the health of the patient."

89.     Thus, Defendants submitted or caused to be submitted a false statement to the government in its CMS Form 1500s when it submitted claims seeking reimbursement for medically unnecessary supplies and devices.

90.     Knowingly submitting false claims to the government for reimbursement creates liability under the FCA.[3]  Thus, each of these claims to the government from Zynex constituted a violation of section 3729 of the FCA and the State FCAs.

_____

[3] Knowingly causing the submission of claims that are ineligible for payment under a federal healthcare program constitutes a violation of the FCA.  *See U.S. ex. rel. Franklin v. Parke-Davis*, 147 F. Supp. 147, 152-153 (D. Mass. 2001); *See also U.S. ex rel. Nowak v. Medtronic, Inc.,* Case Nos. 1:08-cv-10368 and 09-cv-11625, D. Mass. (United States of America's Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program . . . because the program places other conditions on coverage that are not satisfied, the claim is false"), and *U. S. v. Medco Physicians Unlimited*, 2000 U.S. Dist. LEXIS 5843, at *27 (N.D. Ill. Mar. 15, 2000) (granting partial summary judgment for plaintiff on the

91.     In addition, Zynex made false certifications in its DME supplier agreement to provide DME to Medicare beneficiaries.  That is, in the supplier agreement, Zynex certified:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

92.     As a DME supplier, Zynex was also required to meet certain "supplier standards" under the applicable statutes. 42 CFR §424.57(c).  Accordingly, Zynex certified in its application for billing privileges that it "[o]perates its business and furnishes Medicare-covered items in compliance with all applicable Federal and State licensure and regulatory requirements." 42 CFR §424.57(c)(1).

93.     Compliance with the supplier agreement and supplier standards is a precondition for payment by Medicare and by submitting claims in violation of the supplier agreement and supplier standards, Zynex knowingly submitted false claims for reimbursement.  Knowingly submitting false claims to the government for reimbursement creates liability under the FCA.  Thus, each of these claims to the government from Zynex constituted a violation of section 3729 of the FCA and State FCAs.

## VII.    COUNTS

### COUNT I

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)[1986] and
### 31 U.S.C. §3729(a)(1)(A)[2009]

94.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

---

issue of liability with respect to its claim that Medco submitted false claims for non-reimbursable meals and transportation costs.)

95.     Defendant knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

96.     By virtue of the false or fraudulent claims that Defendant presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT II

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)(B)[2009]

97.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

98.     Defendant knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government.  Defendant's false records or statements caused the Plaintiff States to submit false and inflated claims to the United States for the federal portion of Medicaid in violation of 31 U.S.C. §3729(a)(1)(B)[2009].

99.     In addition, Defendant knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government in violation of 31 U.S.C. §3729(a)(1)(B)[2009].

100.    By virtue of the false or fraudulent claims that Defendant caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III

### THE CALIFORNIA FALSE CLAIMS ACT
### CALIFORNIA GOVERNMENT CODE §§ 12651, et seq.

101.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

102.     Through these acts, Defendant have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 12651(a)(1) of the Act.  Such claims caused actual damages to the State.

103.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 12651(a)(2) of the Act.  Such claims caused actual damages to the State.

## COUNT IV

### COLORADO MEDICAID FALSE CLAIMS ACT
### C.R.S. §25.5-4-303.5 ET SEQ.

104.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

105.     Through these acts, Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 25.5-4- 305(1)(a) of the Act.  Such claims caused actual damages to the State.

106.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of the Act.  Such claims caused actual damages to the State.

## COUNT V

### CONNECTICUT FALSE CLAIMS ACT
### FOR PUBLIC ASSISTANCE PROGRAMS
### CONN. GEN. STAT. § 17b-301 et seq.

107.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

108.     Through these acts, Defendant have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17b-301b(1) of the Act.  Such claims caused actual damages to the State.

109.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 17b-301b(2) of the Act.  Such claims caused actual damages to the State.

## COUNT VI

### THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### DEL. CODE ANN. TIT. 6, § 1201 et seq.

110.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

111.     Through these acts, Defendant have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1201(a)(1) of the Act.  Such claims caused actual damages to the State.

112.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1201(a)(2) of the Act.  Such claims caused actual damages to the State.

## COUNT VII

### DISTRICT OF COLUMBIA FALSE CLAIMS ACT
### D.C. CODE ANN. §2-381.01 et seq.

113.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

114.    Through these acts, Defendant have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2-381.02(a)(1) of the Act.  Such claims caused actual damages to the State.

115.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 2-381.02(a)(2) of the Act.  Such claims caused actual damages to the State.

## COUNT VIII

### THE FLORIDA FALSE CLAIMS ACT
### FLA. STAT. §§ 68.082(2) et seq.

116.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

117.    Through these acts, Defendant have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

118.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 68.082(2)(b) of the Act.  Such claims caused actual damages to the State.

## COUNT IX

### GEORGIA FALSE MEDICAID CLAIMS ACT
### GA. CODE ANN. §49-4-168.1 et seq.

119.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

120.     Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 49-4-168.1(a)(1) of the Act.  Such claims caused actual damages to the State.

121.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 49-4-168.1(a)(2) of the Act.  Such claims caused actual damages to the State.

### COUNT X

### HAWAII FALSE CLAIMS ACT
### HAW. REV. STAT. §661-21 et seq.

122.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

123.     Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 661-21(a)(1) of the Act.  Such claims caused actual damages to the State.

124.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 661-21(a)(2) of the Act.  Such claims caused actual damages to the State.

### COUNT XI

### THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 ILL. COMP. STAT. ANN. §§ 175/3 et seq.

125.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

126.     Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 175/3(a)(1)(A) of the Act.  Such claims caused actual damages to the State.

127.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 175/3(a)(1)(B) of the Act.  Such claims caused actual damages to the State.

## COUNT XII

### THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, INDIANA CODE 5-11-5.5-2 et seq.

128.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

129.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5-11-5.5-2(b)(1)  of the Act.  Such claims caused actual damages to the State.

130.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5-11-5.5-2(b)(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XIII

### LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW LA. REV. STAT. § 46:438.3 et seq.

131.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

132.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(A) of the Act.  Such claims caused actual damages to the State.

133.     Through these acts, Defendant knowingly engaged in misrepresentation to obtain or attempt to obtain payment from the State in violation of Section 46:438.3(B) of the Act.  Such claims caused actual damages to the State.

## COUNT XIV

### THE MARYLAND FALSE HEALTH CLAIMS ACT OF 2010
### MD. CODE ANN. § 2-602 *et seq.*

134.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

135.     Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2-602(a)(1) of the Act. Such claims caused actual damages to the State.

136.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 2-602(a)(2) of the Act.  Such claims caused actual damages to the State.

## COUNT XV

### THE MASSACHUSETTS FALSE CLAIMS ACT
### MASS. ANN.  LAWS. CH. 12, §§ 5B et seq.

137.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

138.     Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5B(1), of the Act. Such claims caused actual damages to the State.

139.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  5B(2), of the Act.  Such claims caused actual damages to the State.

140.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the State in violation of Section 5B(8) of the Act.

## COUNT XVI

### MICHIGAN MEDICAID FALSE CLAIMS ACT
### MCLS §§ 400.607 et seq.

141.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

142.     Through these acts, Defendant have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 400.607(1), of the Act.  Such claims caused actual damages to the State.

143.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 400.607(3), of the Act.  Such claims caused actual damages to the State.

## COUNT XVII

### MINNESOTA FALSE CLAIMS ACT
### MINN. STAT. §15C.02 et seq.

144.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

145.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section   15C.02(a)(1), of the Act.  Such claims caused actual damages to the State.

146.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 15C.01(a)(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XVIII

### MONTANA FALSE CLAIMS ACT
### MONT. CODE ANN. 17-8-401 et seq.

147.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

148.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17-8-403(1)(a), of the Act.  Such claims caused actual damages to the State.

149.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 17-8-403(1)(b), of the Act.  Such claims caused actual damages to the State.

## COUNT XIX

### THE NEVADA SUBMISSION OF FALSE CLAIMS
### TO STATE OR LOCAL GOVERNMENT ACT
### NEV. REV. STAT. §§ 357.040 et seq.

150.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

151.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 357.040(1)(a), of the Act.  Such claims caused actual damages to the State.

152.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 357.040(1)(b), of the Act.  Such claims caused actual damages to the State.

## COUNT XX

### NEW JERSEY FALSE CLAIMS ACT
### N.J. STAT. §2A:32C-3 et seq.

153.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

154.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2A:32C-3(a), of the Act.  Such claims caused actual damages to the State.

155.    Through these acts, Defendant knowingly made, used, or caused to be made or used false  records or statements material to a false or fraudulent claim to the State, in violation of Section 2A:32C-3(b), of the Act.  Such claims caused actual damages to the State.

## COUNT XXI

### THE NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. STAT. ANN. § 27-14-4A et seq.

156.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

157.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 27-14-A, of the Act. Such claims caused actual damages to the State.

158.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 27-14-4B, of the Act. Such claims caused actual damages to the State.

**COUNT XXII**

**NEW YORK FALSE CLAIMS ACT**
**NY CLS ST. FIN. §187 et seq.**

159.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

160.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 189(1)(a), of the Act. Such claims caused actual damages to the State.

161.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 189(1)(b), of the Act. Such claims caused actual damages to the State.

**COUNT XXIII**

**NORTH CAROLINA FALSE CLAIMS ACT**
**N.C. GEN. STAT. §1-607(A) et seq.**

162.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

163.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1-607(a)(1), of the Act. Such claims caused actual damages to the State.

164.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1-607(a)(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XXIV

### OKLAHOMA MEDICAID FALSE CLAIMS ACT
### OKLA. STAT. TIT. 63, §5053 et seq.

165.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

166.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5053.1B(1), of the Act. Such claims caused actual damages to the State.

167.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5053.1B(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XXV

### RHODE ISLAND STATE FALSE CLAIMS ACT
### R.I. GEN. LAWS §9-1.1-1 et seq.

168.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

169.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 9-1.1-3(1), of the Act. Such claims caused actual damages to the State.

170.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 9-1.1-3(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XXVI

### THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### TENN. CODE ANN. §§ 71-5-182(a) et seq.

171.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

172.    Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 71-5-182(a)(1), of the Act.  Such claims caused actual damages to the State.

173.    Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 71-5-182(a)(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XXVII

### TEXAS MEDICAID FRAUD PREVENTION ACT
### TEX. HUM. RES. CODE ANN. §36.002(1), (2)

174.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

175.    By virtue of the acts described above, Defendant Zynex knowingly submitted to officers, employees or agents of the State of Texas, false or fraudulent claims for payment or approval.

176.    By virtue of the acts described above, Defendant knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit Zynex to receive a benefit or payment under the Texas Medicaid program that was not authorized and/or was greater than the benefit or payment that was authorized in violation of Section 36.002(1).  Such claims caused actual damages to the State.

177.     By virtue of the acts described above, Defendant Zynex knowingly concealed or failed to disclose information that permitted a person to receive a benefit under the Medicaid program that was not authorized or that was greater than the benefit that was authorized in violation of Section 36.002(2).  Such conduct caused actual damages to the State.

**COUNT XXVIII**

**THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT**
**VA. CODE §§ 8.01-216.3A et seq.**

1.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

2.     Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 8.01-216.3A(1), of the Act.  Such claims caused actual damages to the State.

3.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 8.01-216.3A(2), of the Act.  Such claims caused actual damages to the State.

**COUNT XXIX**

**WASHINGTON HEALTH CARE FALSE CLAIM ACT**
**WASH. REV. CODE §§ 48.80.030(1), (2), (3)**

4.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

5.     Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 48.80.030(1), of the Act.  Such claims caused actual damages to the State.

6.     Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment for medically unnecessary services to the State in violation of Section 48.80.030(2), of the Act.  Such claims caused actual damages to the State.

7.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 48.80.030(3), of the Act.  Such claims caused actual damages to the State.

### COUNT XXX

### WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT
### WIS. STAT. §20.931 et seq.

8.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

9.     Through these acts, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 20.931(2)(a), of the Act.  Such claims caused actual damages to the State.

10.     Through these acts, Defendant knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  20.931(2)(b), of the Act.  Such claims caused actual damages to the State.

### PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in his favor and against Defendant for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other

recoveries or relief provided for under the Federal False Claims Act and the State False Claims Acts.

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

Dated: April 8, 2014                              Respectfully submitted,


By:    /s/  David K. TeSelle
          BURG SIMPSON
          ELDREDGE HERSH & JARDINE, P.C.
          Seth A. Katz, #37205
          David K. TeSelle, #29648
          Kevin M. Bemis, #40216
          40 Inverness Drive East
          Englewood, CO  80112
          Tel: (303) 792-5595
          Fax: (303) 708-0527
          skatz@burgsimpson.com
          dteselle@burgsimpson.com
          kbemis@burgsimpson.com

          BERGER & MONTAGUE, P.C.
          Daniel R. Miller (PA Bar No. 68141)
          Joy Clairmont (PA Bar No. 82775)
          1622 Locust Street
          Philadelphia, PA 19103
          Tel: (215) 875-3000
          Fax: (215) 875-4604
          dmiller@bm.net
          jclairmont@bm.net


          *Counsel for Relator*

KAL6455641

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2014 a true and correct copy of the Relator's Complaint Pursuant to the Federal False Claims Act, 31 U.S.C. §§3729 et seq. and Supplemental State False Claims Acts was served on the following via certified mail.

Hon. Eric H. Holder, Jr.
Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Kamala D. Harris
Attorney General
Office of the Attorney General
1300 "I" Street, Suite 1740
Sacramento, CA  95814

Robert Ferguson
Attorney General
1125 Washington Street, SE
P.O. Box 40100
Olympia, WA  98504-0100

George Jepsen, Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120

Joseph R. Biden, III
Attorney General
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

J. B. Van Hollen
Attorney General
Wisconsin Department of Justice
State Capitol, Room 114 East
P.O. Box 7857
Madison, WI  53707-7857

Pam Bondi, Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Jeff Atwater
Chief Financial Officer
Florida Dept. Of Financial Services
200 East Gaines Street
Tallahassee, FL  32399-0300

Sam Olens
Attorney General
40  Capitol Square SW
Atlanta, GA  30334-1300

Lisa Madigan
Attorney General
James R. Thompson Ctr.
100 W. Randolph Street
Chicago, IL 60601

Greg Zoeller
Attorney General
Indiana Government Center South
302 W. Washington Street, 5th Fl.
Indianapolis, IN 46204

John Suthers
Ralph L. Carr Colorado
Judicial Center
1300 Broadway, 10th Fl.
Denver, CO  80203

James D. Caldwell
Attorney General
P.O. Box 94095
Baton Rouge, LA  70804-4095

Martha Coakley
Attorney General
One Ashburton Place
Boston, MA 02108-1698

Bill Schuette
Attorney General
525 W. Ottawa Street
P.O. Box 30212
Lansing, MI   48908-0212

Robert E. Cooper, Jr.
Attorney General
425 5th Avenue North
Nashville, TN  37243

Roy Cooper
Attorney General
Department of Justice
P.O. Box 629
Raleigh, NC  27602-0629

John Jay Hoffman
Acting Attorney General
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 080
Trenton, NJ  08625

Gary King
Attorney General
State of New Mexico
P.O. Drawer 1508
Santa Fe, NM  87504-1508

Catherine Cortez Masto
Attorney General
Office of the Attorney General
Old Supreme Ct. Building
100 North Carson Street
Carson City, NV 89701

Scott Pruitt
Attorney General
313 N.E. 21st Street
Oklahoma City, OK  73105

Irvin Nathan
Attorney General
441 4th Street, NW
Suite 1100S
Washington, DC  20001

Ken Cuccinelli
Attorney General
Office of the Attorney General
900 East Main Street
Richmond, VA 23219

Sidonie Squier
Cabinet Secretary
New Mexico Human
Services Department
Office of the Secretary
P.O. Box 2348
Santa Fe, NM  87504

David Louie
Attorney General
425 Queen Street
Honolulu, HI  46813

Douglas F. Gansler
Attorney General
200 St. Paul Place
Baltimore, MD  21202-22012

Lori Swanson
Attorney General
State Capitol, Suite 102
St. Paul, MN  55155

Tim Fox
Attorney General
Justice Building
215 N. Sanders
Helena, MT  59620-1401

Eric Schneiderman
Attorney General
Department of Law
The Capitol, 2nd Floor
Albany, NY  12224

Peter Kilmartin
Attorney General
150 S. Main Street
Providence, RI 02903

Gregg Abbott, Attorney General
Office of the Attorney General
Capitol Station
P.O. Box 12548
Austin, TX  78711-2548

John F. Walsh
U.S. Attorney General
1225 17th Street
Suite 700
Denver, CO  80202

Kevin Traskos, Chief, Civil Division
U.S. Attorney's Office
1225 17th Street, Suite 700
Denver, CO  80202

Edwin Winstead
Chief Civil Health Care
U.S. Attorney General
1225 17th Street
Suite 700
Denver, CO  80202

/s/ Joy P. Clairmont
Joy P. Clairmont

Kal6636933